No. 00-339

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 125N

MARY HILLABRAND,

Plaintiff and Respondent,

v.

McDOUGAL BOTANICAL TRUST,

M. MARGARET NIGRELLE, TRUSTEE,

Defendant and Appellant.

APPEAL FROM: District Court of the Twentieth Judicial District,

In and for the County of Lake,

The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Edward A. Murphy, Datsopoulos, MacDonald & Lind, Missoula, Montana

For Respondent:

John A. Mercer, French, Mercer, Grainey & O'Neill, Polson, Montana

Submitted on Briefs: September 7, 2000
Decided: July 23, 2001

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 Mary Hillabrand brought this action in the Twentieth Judicial District Court, Lake County, for specific performance of a buy/sell agreement she entered into with the McDougal Botanical Trust (the Trust) regarding a parcel of real property. The District Court granted summary judgment in Hillabrand's favor and the Trust appeals. We affirm.

¶3 The Trust raises the following issue on appeal:

¶4 **Whether the District Court erred in determining that the buy/sell agreement is a valid enforceable contract and that performance is not excused by law or the language of the contract.**

## Factual and Procedural Background

¶5 The Trust was established in the state of Texas by the Frank and Margaret Nigrelle family. On July 10, 1998, Frank Nigrelle and three of his friends met Stephani Bradshaw, a real estate agent, at the Ninepipe Lodge near St. Ignatius for the purpose of viewing a parcel of land known as the Ramshead Ranch. The ranch, located in Lake County, was owned by Hillabrand. Hillabrand's real estate agent, John Thuma, accompanied the group to the ranch.

¶6 The house on the ranch was occupied at that time by Dr. Michael Brownstein,

Hillabrand's estranged husband. Brownstein was already displeased over the proposed sale of the property and the party's arrival at the ranch 15 minutes past their appointed time angered him even more. Brownstein told the group that he was going to litigate over the property, that he would file a *lis pendens*, and that the property would not be saleable. Before leaving, Thuma pointed out to Bradshaw that there was a shotgun near the front door of the residence.

¶7 Because of the confrontation with Brownstein, Frank decided not to submit an offer for the ranch. However, several weeks after their visit to the ranch, Thuma sent Bradshaw a copy of an August 8, 1998 letter from Brownstein's attorney indicating that the issues preventing a sale had been resolved. The letter stated that Hillabrand and Brownstein had reached an agreement regarding their marital property, including the Ramshead Ranch, and that a Consent to Entry of a Final Decree of Dissolution had been given. The letter further stated that the *lis pendens* would be removed from the property.

¶8 After these assurances, Frank had the property surveyed and submitted an offer on behalf of the Trust in October 1998. Hillabrand did not accept the offer, however, because it was too low. Thereafter, Hillabrand received a competing offer from another party and no further action involving the Trust occurred until the following spring.

¶9 In March 1999, Thuma called Bradshaw to advise her that the competing offer was not going to result in a sale. Thuma indicated that Hillabrand would probably accept $1,000,000 with no contingencies. With that in mind, Bradshaw arranged to have the property inspected before submitting an offer.

¶10 On the day scheduled for the inspections, Brownstein called Thuma in a rage and declared that no inspections would be allowed. When Thuma informed Bradshaw of the call, Bradshaw explained that the property had to be inspected before any offer would be made. Eventually, Brownstein relented and allowed only the pest inspector on the property, but insisted that he not enter the house. That inspection occurred without incident.

¶11 Later that day, Thuma phoned Bradshaw again and informed her that Brownstein would allow the inspections of the plumbing, electricity and the like to take place the following day. Thuma also told her that Hillabrand's brother-in-law, Steve, would be at the ranch to make sure there were no further problems. With these assurances, Bradshaw made arrangements for the remaining inspections. The following day, when Bradshaw and

the contractors who were to perform the inspections arrived at the ranch, Steve met them and told them they could not go into the house as Brownstein was talking to his attorney. Brownstein was angry because Hillabrand had moved some furniture out of the house. Bradshaw later testified in her deposition that although she was standing outside the house, she could hear Brownstein inside screaming and yelling at someone.

¶12 Even though they could not enter the house, the contractors were able to complete their inspections because the house has an underground area that holds much of the equipment they needed to inspect and that underground area is accessible from the outside. However, before they were quite finished, Brownstein came out of the house and yelled at Bradshaw that the house was not going to sell and he would do something about it. When Brownstein began screaming obscenities, everyone left.

¶13 A short time after Bradshaw returned to her office, she received a call from Brownstein accusing one of the inspectors of sneaking into the house and stealing one of his handguns. Brownstein told Bradshaw that he had called the police and that he intended to hold her responsible. Sometime later that day, Brownstein left a message with someone in Bradshaw's office that he had found the gun.

¶14 Bradshaw called the Nigrelles to inform them of Brownstein's behavior during and after the inspections. Although the Nigrelles were concerned, they nevertheless executed a buy/sell agreement for the ranch on behalf of the Trust on March 31, 1999.

¶15 On April 20, 1999, the Nigrelles and Bradshaw went to the ranch to look things over and decide what remodeling they wanted done to the house. With them were an architect and a contractor, both from Missoula, and Hillabrand's brother-in-law, Steve. Upon entering the house, they found it in a shambles. There was a gunshot hole through one of the bedroom windows. There were broken pieces of statuary and ceramics scattered about the house. A large antler chandelier had been broken. The fireplace hood was scorched and the paint on the hood had begun to bubble from the heat. There were large stains on the carpeting and dents in the walls.

¶16 According to Bradshaw, when Steve informed the group that Brownstein planned to move into a mobile home that was located on an adjacent piece of property at the base of the driveway to the residence, Margaret Nigrelle's face turned white. Margaret became very distraught and talked about putting in a complete burglar alarm system, a special electric gate for protection, and a surveillance system.

¶17 The following week, Margaret faxed a letter to Bradshaw who in turn faxed it to Thuma. The letter, dated April 28, 1999, stated that the Trust would not close on the contract on May 28, 1999, as originally intended unless Hillabrand could demonstrate that Brownstein would not be residing on the adjacent property. Two weeks later, Bradshaw received another letter from Margaret, dated May 14, 1999, in which Margaret indicated that had she known prior to signing the buy/sell agreement that Brownstein intended to live on the adjacent property, she would not have signed the agreement. Consequently, Margaret indicated that she considered the agreement null and void and requested the return of the Trust's earnest money.

¶18 On May 26, 1999, Thuma forwarded a letter to Bradshaw regarding Brownstein. The letter was written by Brownstein's attorney and addressed to Hillabrand's attorney. The letter indicated that Brownstein no longer intended to live on the property adjacent to the ranch. Nevertheless, the Nigrelles refused to close on the ranch.

¶19 On July 6, 1999, Hillabrand brought this action for specific performance of the buy/sell agreement or, in the alternative, damages. The Nigrelles filed a counterclaim for the return of the earnest money paid to Hillabrand's real estate agent contending that the agreement had been rescinded. The Nigrelles later testified in their depositions that they rescinded the agreement because they feared for their safety and the safety of their property. They further testified that Hillabrand was responsible in part for the situation because she created an atmosphere of risk and peril by allowing Brownstein to remain on the property and threaten people.

¶20 Hillabrand moved for summary judgment on February 15, 2000. Following a hearing on the motion, the District Court entered its order wherein the court determined that the buy/sell agreement is a valid and enforceable contract and that the Trust breached that contract when it failed to complete the purchase because no provision of law or of the contract excused performance. Thus, the court granted Hillabrand's motion for summary judgment and ordered specific performance on the agreement.

¶21 The District Court further ordered that within 30 days of the entry of judgment, the Trust deliver to the title company the balance of the purchase price under the contract, together with the closing costs, less the earnest money already deposited, and that Hillabrand deliver to the title company a warranty deed transferring merchantable title for the property to the Trust. The court also awarded Hillabrand her reasonable costs and attorney fees. The Trust appeals the District Court's Order Granting Plaintiff's Motion for

Summary Judgment.

## Standard of Review

¶22 Our standard of review in appeals from summary judgment rulings is *de novo. Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 21, 297 Mont. 336, ¶ 21, 993 P.2d 11, ¶ 21 (citing *Motarie v. N. Mont. Joint Refuse Disposal* (1995), 274 Mont. 239, 242, 907 P.2d 154, 156; *Mead v. M.S.B., Inc.* (1994), 264 Mont. 465, 470, 872 P.2d 782, 785). When we review a district court's grant of summary judgment, we apply the same evaluation as the district court based on Rule 56, M.R.Civ.P. *Oliver*, ¶ 21 (citing *Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264, 900 P.2d 901, 903). We set forth our inquiry in *Bruner* as follows:

> The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. We review the legal determinations made by a district court as to whether the court erred.

*Oliver, ¶ 21 (quoting Bruner, 272 Mont. at 264-65, 900 P.2d at 903). "Summary judgment is an extreme remedy which should never be substituted for a trial if a material factual controversy exists." Montana Metal Buildings., Inc. v. Shapiro (1997), 283 Mont. 471, 474, 942 P.2d 694, 696 (citing Clark v. Eagle Systems, Inc. (1996), 279 Mont. 279, 283, 927 P.2d 995, 997).*

¶23 Moreover, in a summary judgment proceeding, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences will be drawn therefrom in favor of the party opposing summary judgment. *Oliver*, ¶ 22 (citing *Joyce v. Garnaas*, 1999 MT 170, ¶ 8, 295 Mont. 198, ¶ 8, 983 P.2d 369, ¶ 8). Consequently, we will view the evidence in the light most favorable to the Trust and all reasonable inferences will be drawn in favor of the Trust.

## Discussion

¶24 *Whether the District Court erred in determining that the buy/sell agreement is a valid enforceable contract and that performance is not excused by law or the language of the*

*contract.*

¶25 Margaret, as Trustee, argues on behalf of the Trust, that the District Court erred in determining that the buy/sell agreement is a valid and enforceable contract and that no provision of that contract excuses performance. Margaret contends that a purchaser under a buy/sell agreement can rescind the agreement if there are breaches by the seller that defeat the essential purpose of the contract. In this case, Margaret argues that one of the essential purposes of the contract is to obtain the quiet and peaceful enjoyment of the property. She maintains that this could not be accomplished here because Brownstein, who had repeatedly exhibited threatening and intimidating behavior over the sale of the property, planned to move into a trailer on the adjacent property.

¶26 Margaret also argues that damage to the property by Brownstein made the buy/sell agreement voidable under the express terms of the contract. Thus, Margaret contends that there are issues of material fact--whether Hillabrand acted reasonably and whether the intimidation defeated the essential purpose of the agreement--preventing disposition of this case on a motion for summary judgment.

¶27 Hillabrand argues on the other hand, that the threat that a seller's estranged husband will move in next door to the subject property is not a legal basis upon which a real estate buy/sell agreement can be rescinded by the buyer particularly where the buyer, for over one year prior to executing the agreement, knew of the estranged husband's threatening and confrontational behavior and where the buyer, prior to the date set for closing, was provided with documentation that the estranged husband would not, in fact, live next door. Moreover, Hillabrand submits that Margaret offered no legal authority for the proposition that a real estate purchase agreement may be rescinded because of an undesirable neighbor.

¶28 In addition, Hillabrand maintains that the damage to the property by Brownstein was minor, easily repairable, and insignificant because the Trust planned to do "major remodeling" anyway. Hillabrand argues that the insignificance of the damage is evidenced by Margaret's May 14, 1999 letter seeking to cancel the transaction wherein Margaret makes no reference to any physical damage to the property. Finally, Hillabrand contends that even if the buy/sell agreement was breached as a result of Brownstein's threats or by the minor damage to the property, such breach does not, as a matter of law, justify rescission.

¶29 Hillabrand's arguments are well taken. This Court has previously held that

[a] breach which goes to only part of the consideration, is incidental and subordinate to the main purpose of the contract, and may be compensated in damages does not warrant a rescission of the contract; the injured party is still bound to perform his part of the agreement, and his only remedy for the breach consists of the damages he has suffered therefrom.

*Halcro v. Moon (1987), 226 Mont. 121, 125, 733 P.2d 1305, 1307 (quoting Johnson v. Meiers (1946), 118 Mont. 258, 263, 164 P.2d 1012, 1014). Furthermore, § 28-2-1711, MCA, provides:*

**When party may rescind.** A party to a contract may rescind the same in the following cases only:

(1) if the consent of the party rescinding or of any party jointly contracting with him was given by mistake or obtained through duress, menace, fraud, or undue influence exercised by or with the connivance of the party as to whom he rescinds or of any other party to the contract jointly interested with such party;

(2) if, through the fault of the party as to whom he rescinds, the consideration for his obligation fails in whole or in part;

(3) if such consideration becomes entirely void from any cause;

(4) if such consideration, before it is rendered to him, fails in a material respect from any cause; or

(5) if all the other parties consent.

None of the provisions of this statute apply in this case.

¶30 In addition, the buy/sell agreement contains the following language:

**RISK OF LOSS:** Prior to closing of this sale, all risk of loss shall remain with the Seller, in addition, should the property be materially damaged by fire or other cause prior to closing, this agreement shall be voidable at the option of the Buyer.

Margaret incorrectly argues that under this provision, the agreement is voidable because of the damage done to the property by Brownstein. However, Margaret has not demonstrated, nor can she, that the property was "materially damaged." Contrary to her contentions, the proper remedy is not rescission of the contract, but rather, compensation for the damage.

¶31 In addition, Margaret cites no authority for her contention that an agreement may be rescinded because of an undesirable neighbor. Moreover, Margaret executed the buy/sell agreement on behalf of the Trust even though Brownstein had demonstrated threatening and confrontational behavior for over a year prior to the date the agreement was executed.

¶32 Margaret relies on *Compton v. Alcorn* (1976), 171 Mont. 230, 557 P.2d 292, for the proposition that if a breach defeats the purpose of the contract, then rescission of the buy/sell agreement is warranted. However, Margaret's reliance on *Compton* is misplaced because *Compton* dealt with actual safety defects in a mobile home, not minor vandalism and the unrealized threat that the seller's estranged husband was moving in next door. We held in *Compton* that the partial breach in that case was "so substantial and fundamental as to defeat the object of the parties in making the agreement." *Compton*, 171 Mont. at 235, 557 P.2d at 295. That is not the case here.

¶33 Margaret also relies on *Ogg v. Herman* (1924), 71 Mont. 10, 15-16, 227 P. 476, 477, for the proposition that Hillabrand had the obligation to provide marketable and merchantable title of such character as assures to the purchaser the quiet and peaceable enjoyment of the property. Once again Margaret's reliance is misplaced. *Ogg* dealt with title defects of record consisting of a restrictive building covenant that would prevent the buyer from using the property to carry on various business activities. No such title defects exist in the case *sub judice*.

¶34 Moreover, in *Kasala v. Kalispell Pee Wee Baseball League* (1968), 151 Mont. 109, 115, 439 P.2d 65, 69, we stated that "even an intentional interference with the use and enjoyment of land is not actionable unless the interference be both substantial and unreasonable." Here, a mere threat to move in next door, a threat that was proven to be without foundation, cannot be the basis for rescinding the buy/sell agreement.

¶35 Accordingly, we hold that the District Court did not err in determining that the buy/sell agreement is a valid enforceable contract and that performance is not excused by law or the language of the contract.

¶36 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER